Filed 7/1/13  P. v. Lugo CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054781 |
| v. | (Super.Ct.No. BAF005700) |
| LARRY DWAYNE LUGO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michele D. Levine, Judge.  Affirmed.

Thomas K. Eckhardt for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Larry D. Lugo of four counts of premeditated attempted murder (Counts 3-6—Pen. Code, §§ 664, 187, subd. (a)), four counts of attempted murder (Counts 10-13—Pen. Code, §§ 664, 187, subd. (a)), and one

count of evading law enforcement with disregard for the safety and property of others (Count 7—Veh. Code, § 2800.2). The jury additionally found true, with respect to Counts 3 through 6 and 10 through 13, allegations defendant personally and intentionally discharged a firearm (Pen. Code, § 12022.53, subd. (c)), and knew or reasonably should have known the victims were peace officers engaged in the performance of their duties (Pen. Code, § 664, subds. (e) & (f)).[1] The court sentenced defendant to a determinate term of incarceration of 166 years and an indeterminate term of 60 years to life.

On appeal, defendant raises six issues: (1) the court erred in declining to sever trial on Counts 1 and 2 from the remaining charges; (2) the court erred in declining to dismiss a juror for misconduct; (3) the court erred in denying defendant's motion for new trial; (4) the court abused its discretion in precluding defendant's defense on several bases; (5) the court erred by prohibiting evidence of third party culpability; and (6) defendant was cumulatively prejudiced by the aforementioned errors.[2] We affirm the judgment.

---

[1] The jury acquitted defendant of assault with a deadly weapon on a peace officer (Count 1—Pen. Code, § 245, subd. (c)), and another count of evading law enforcement (Count 2—Veh. Code, § 2800.2). The jury hung on Counts 8 and 9 and the premeditation allegations attached to Counts 10 through 13; the court declared a mistrial with respect to those counts and allegations.

[2] In his reply brief, defendant raises for the first time an additional argument that the trial court demonstrated bias against defendant when, during venire, the court discussed recent police officer deaths and proceedings that honored them. "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)

# FACTUAL AND PROCEDURAL HISTORY[3]

On December 2, 2007, CHP Officer Richard Murrieta was patrolling the Interstate 10 freeway in the areas of Beaumont and Banning with his partner, Officer Jeff O'Steen. At approximately 2:30 a.m., they observed a silver PT Cruiser with a broken taillight slightly weaving over the course of a couple miles. They attempted to conduct a traffic stop of the vehicle as it exited the freeway. As soon as the patrol car's red emergency lights came on, the PT Cruiser accelerated through a stop sign and made a left turn. The PT Cruiser attempted to reenter the Interstate 10 freeway traveling eastbound; the vehicle abruptly stopped.

The patrol car stopped two to three car lengths behind the PT Cruiser. Murrieta witnessed a man sticking his torso out of the right rear passenger window with his arm extended toward them with what appeared to be a handgun; he fired three shots at the officers. The individual got back into the PT Cruiser and the vehicle continued on to the eastbound Interstate 10 freeway.

Murrieta relayed to dispatch their location and that they had been fired upon. They then activated the patrol car's sirens and pursued the fleeing PT Cruiser as it approached speeds of up to 95 miles per hour. As the PT Cruiser began exiting the freeway again, the same individual hung out of the right rear side of the PT Cruiser and

---

[3] Since, the jury acquitted defendant of the charges alleged in Counts 1 and 2, we have omitted the facts relevant to those charges from our statement of facts. However, the facts regarding those charges will be discussed below as relevant to issues raised by defendant.

fired another two to three shots toward the officers. After traveling approximately six additional miles, the individual again fired several more shots at the officers.

At some point, another CHP patrol car driven by Officer James Hefele and containing Officer Michael Forguson took the lead in the pursuit. The individual in the PT Cruiser then fired up to seven rounds at the patrol cars. As the pursuit continued, the individual fired at the officers up to an additional seven times at various locations with at least two shots each time. Hefele could hear the sounds of bullet fragments hitting the undercarriage of his patrol car.

The PT Cruiser eventually entered the Soboba Indian Reservation.[4] The PT Cruiser stopped in a field where it turned around and headed toward Hefele's patrol car. Hefele fired several shots at the PT Cruiser. The PT Cruiser then stopped and several occupants fled from the PT Cruiser into the dark. Murrieta later identified the shooter as a Hispanic male. Hefele testified the shooter was an adult male who appeared Hispanic. Defendant matched the descriptions provided by the officers.

Police responding to the scene found all four doors of the PT Cruiser open. Swabs of four recent drops of blood on the rear passenger door were collected. Four .40-caliber rounds were retrieved from the vehicle. One expended .40-caliber shell was also found, as well as a cardboard ammunition box on which was a drop of blood.

_____

[4] A security officer working at a business located on the pursuit route witnessed a portion of the chase and twice heard two gunshots. Surveillance video of the chase from the business was played for the jury. The security officer found a .40-caliber shell in the area where he heard at least one of the gunshots; the shell matched the ammunition later found inside the PT Cruiser.

On December 31, 2007, Sheriff's Lieutenant John Burden was patrolling the Soboba Indian Reservation with Deputy Brandon Mullins after reports of a shooting involving two vehicles earlier that day. One of the vehicles was described as a silver Jeep and included its entire license plate number. Around 11:00 p.m. Burden encountered the Jeep. He then attempted to initiate a traffic stop. The Jeep accelerated to speeds in excess of 90 miles per hour. Someone on the driver's side of the vehicle began shooting at them.

Burden contacted dispatch to report they were being shot at. Soon thereafter, Deputy Patrick Carroll, driving another patrol vehicle containing Deputy Randy Lung, took over as the primary vehicle in the pursuit. Another police vehicle driven by Deputy Jerry Osterloh and containing Deputy Mark Janecka joined the pursuit as well. The chase reached speeds of up to 90 miles per hour until they headed into a winding canyon and then into a recreational area known as "The Oaks."

In the parking lot of The Oaks, the Jeep had been turned so that the driver's side now faced the pursuing patrol vehicles; several shots were then fired from the Jeep. The windshield of the patrol car driven by Osterloh shattered when a bullet hit it directly in front of Osterloh's seat, at his chest level; shards of glass flew inside the vehicle spraying the deputies. Another bullet hit the passenger side window of the patrol car being driven by Carroll.

After ensuring neither deputy was injured, Janecka and Osterloh pursued the Jeep onto a baseball field. They stopped adjacent to the field where the Jeep started coming toward them. The deputies exited the patrol car and started firing at the Jeep. The Jeep

5

turned, headed over a berm, and drove up a hill into the adjacent mountains where it was abandoned when it became buried in sand up to its axles. The officers decided not to pursue the vehicle into the mountains because it was dark and they feared being ambushed.

When officers later approached the Jeep, they observed a single set of footprints leading from the driver's side of the vehicle to a barbed wire fence. On the fence they found a small piece of blue material. Using a tracking dog, deputies eventually also located a pair of socks, a size 11 pair of shoes, a pair of shorts inside a pair of size 48 pants, a blue hooded sweatshirt, and a .45-caliber handgun. They found .38-caliber bullets in the left rear pocket of the pants.

Inside the Jeep deputies found a .38-caliber revolver; a bag containing 9-millimeter bullets and one .308-millimeter cartridge; a pistol case; two rounds of ammunition—one 9-millimeter and one .308-millimeter—in the center console; and an assault rifle on the rear floorboard. In The Oaks recreation area where the pursuit had ended, an officer found four .45-caliber shell casings that had not been fired by any of the deputies.

A forensic technician obtained fingerprints from several places on the Jeep. Defendant's fingerprints matched those of several taken from the Jeep. A senior criminalist with the Department of Justice extracted DNA from the blood swabs of the PT Cruiser and ammunition box; they matched a DNA profile taken from a swab from the inside of defendant's cheeks. A DNA profile obtained from the socks recovered near the Jeep also matched defendant's DNA profile.

6

U.S. deputy marshals arrested defendant on March 27, 2008, at an apartment in Las Vegas. Inside the apartment they found a Smith and Wesson .45-caliber pistol, and a Glock .40-caliber pistol. They also found a pair of size 48 pants and a pair of size 11 boots.

After test firing the .40-caliber Glock, a criminalist compared the test-fired shells with the two expended shells found in the PT Cruiser; they matched; thus, the criminalist testified the shells found in the PT Cruiser were fired by the Glock found in the apartment in which defendant was arrested.

## DISCUSSION

### A.  SEVERANCE

Defendant contends the trial court erred in declining to sever trial on Counts 1 and 2 from trial on the remaining counts. We disagree.

In addition to the counts discussed *ante*, the People charged defendant by information with three counts involving an incident occurring on July 25, 2007. Those counts originally alleged the premeditated attempted murder of Christopher Norte with a personal discharge of a firearm enhancement (Count 1—Pen. Code, §§ 664, 187, subd. (a), 12022.53, subd. (c)); assault with a deadly weapon, a vehicle, upon a peace officer (Count 2—Pen. Code, § 245, subd. (c)); and driving in wanton disregard for the safety of others while fleeing a peace officer (Count 3—Veh. Code, § 2800.2). Defendant filed a motion seeking to sever trial on Counts 1 through 3 from the remaining counts.

Defendant conceded the offenses alleged in Counts 1 through 3 were of the same class of crimes as the additional counts and allegations; however, defendant maintained

7

he was unfairly prejudiced by the direct evidence in Counts 1 through 3 involving an eyewitness identification, whereas evidence of the remaining counts was solely circumstantial. He further contended no evidence involved in Counts 1 through 3 was cross-admissible with the remaining counts and enhancements.

The People subsequently filed an amended information eliminating Count 1 and renumbering former Counts 2 and 3 as 1 and 2. The court then heard argument on the matter of defendant's motion for severance. The court found Counts 1 and 2 were no more prejudicial than the remaining counts, and were in the same class of crimes as the remaining counts; therefore, it denied defendant's motion for severance.

Penal Code Section 954 broadly "'permits joinder of different offenses not related to the same transaction or event *'if there is a common element of substantial importance in their commission*, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.'" [Citations.] Moreover, . . . the requirement of section 954 that offenses be 'connected together in their commission' may be satisfied even though '*the offenses charged "do not relate to the same transaction and were committed at different times and places . . . against different victims*."' [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218.) We review a trial court's decision to deny a motion to sever for abuse of discretion. (*People v. Thomas* (2012) 53 Cal.4th 771, 799.) "'In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, "we consider the record before the trial court when it made its ruling."' [Citations.]" (*Id*. at p. 798.)

8

Here, the court indicated it had reviewed the preliminary transcript prior to hearing the motion to sever with respect to the offenses occurring on July 25, 2007. Testimony at the preliminary hearing established police officers were dispatched on July 25, 2007, at approximately 3:15 a.m., in response to a shooting. Christopher Norte informed officers he had been present when an argument ensued between defendant and another individual. Norte attempted to intervene; defendant beat him, pulled out a revolver, pointed it at his head, and he then heard two gunshots go off next to his left ear. Norte broke free of defendant; defendant left sometime thereafter. Norte later noticed the right rear window and right tire of his vehicle appeared to have been shot out. An officer later observed three bullet holes in Norte's car.

Officer Terry Felizardo, one of the officers dispatched to the scene of the shooting, observed a vehicle matching the reported description of the vehicle in which defendant had fled; Felizardo initiated a traffic stop. The vehicle pulled into a residential driveway where Felizardo positioned his car behind it; Felizardo and other officers exited their vehicles. Defendant drove the vehicle across the front lawn and exited the property between two patrol cars, nearly hitting one of the officers.

The police officers then engaged in a high-speed pursuit of defendant in which defendant drove his vehicle erratically and dangerously, disobeying multiple traffic laws. Defendant drove the vehicle onto the Morongo Reservation. The CHP then took over the pursuit.

Here, although the offenses charged in the second and third incidents took place at different locations, times, and against different victims, there were common elements of

9

substantial importance in the commission of the offenses in all three incidents. All three incidents involved the use of firearms, assaults on police officers, and successful attempts to evade police officers while driving recklessly and dangerously without regard to the safety of others. Moreover, any prejudice from the inclusion of the offenses in the first incident at trial was outweighed by the overwhelming circumstantial evidence of defendant's identity from the subsequent incidents. Indeed, as the trial court pointed out "one could certainly argue that the fingerprint evidence and the DNA evidence as physical evidence of identification, circumstantially, is more . . . damning than a[n] identification of a person coming from—whether it be an officer or others identifying a person from a fleeing vehicle."

Furthermore, the shooting in the first incident would appear to involve merely the threat of homicide against a civilian because the purported victim was not actually shot, even though the perpetrator easily could have done so at such a close range. It likewise involved the shooting of unoccupied property. Contrasted with what the jury found was multiple, intentional attempts to kill police officers in the latter incidents, evidence of the first incident was far less prejudicial to defendant. As noted by the People, the jury eventually acquitted defendant of the offenses for which he was charged in the first incident. Thus, the court acted within its discretion in denying defendant's motion to sever the counts.

B.  JUROR MISCONDUCT

Defendant contends the court erred in declining to dismiss alternative juror No. 2 (AJ2) for juror misconduct. We disagree.

10

During investigation into purported impropriety by juror No. 4 (J4)[5] alternative juror No. 1 (AJ1) reported to the court that AJ2 had conducted some internet research on defendant's name on AJ2's cell phone. AJ2 had purportedly shown AJ1 a picture on her cell phone; AJ1 informed AJ2 she did not want to see it.

The court then called AJ2 into the courtroom and asked if she knew anything regarding any juror conducting internet research outside the record developed in court. AJ2 reported looking up defendant's name on her cell phone prior to being selected as a juror; the result of the search produced only a Facebook page not related to defendant; she denied sharing the information with any other juror.

The People argued that only J4 should be dismissed. Defense counsel argued both jurors suspected of conducting outside research should be dismissed. The court dismissed J4, but found AJ2's purported misconduct different "because she did that research at a time before she was sworn" and AJ1 "could not even indicate what the photograph was that was on the phone . . . ." J4 was replaced by AJ2.

"In determining [juror] misconduct, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 242.) A juror's receipt of evidence from an outside source "creates a presumption that the defendant was

_____

**5** J4 admitted conducting internet research regarding twins after being sworn in, apparently as a means of demonstrating the DNA evidence was not conclusive on the issue of determining defendant's identity; communicated his findings to other jurors; and stated that he was defendant's only friend on the jury. J4 had also purportedly stated that the bullets (shell casings) in the case did not actually match any of the firearms.

11

prejudiced by the evidence and may establish juror bias. (*People v. Ramos* (2004) 34 Cal.4th 494, 519; *Collins*, at p. 256.) A juror's use of "a computer may be misused to *investigate* the evidence. [Citations.]" (*Collins* at p. 255.)

Here, the trial court's finding that AJ2 had not committed juror misconduct was supported by substantial evidence. AJ2 indicated she had conducted an internet search of defendant's name prior to being sworn in as a juror. She indicated that the result only produced a Facebook page for someone other than defendant. She stated that the result did not come up with a photograph and she did not recall showing it to anyone. Although, AJ1 stated AJ2 had shown her a picture, AJ1 did not say it was a picture of defendant. AJ1 stated that as soon as AJ2 showed AJ1 the picture, AJ1 told her she did not want to look at it. A rational inference of AJ1's statement is that AJ1 did not see of whom the picture on the phone really was. Alternatively, the court could have made a credibility determination in favor of AJ2's statement that no picture came up and that she did not show anything to anyone. In any event, no evidence suggested that AJ2 showed AJ1 a picture of defendant or, if so, that it was at all prejudicial. Thus, the court's ruling was supported by substantial evidence.

C.   MOTION FOR NEW TRIAL

Defendant contends the trial court abused its discretion in denying his motion for new trial based on AJ2's purported juror misconduct. We disagree.

After trial, defendant filed a motion for new trial based in part upon AJ2's alleged juror misconduct. Attached to the motion was a declaration of AJ1 in which she declared that AJ2 had shown AJ1 a picture of defendant on her cell phone after they were both

12

sworn as jurors. Moreover, AJ1 declared the picture was a "Wanted Poster" of defendant describing him as armed and dangerous; AJ1 recognized defendant from the picture due to the neck tattoo on both the individual in the picture and on defendant in the courtroom. The purported Wanted Poster was attached to the motion for new trial, as well as to appellant's opening brief in this case.

At the hearing on defendant's new trial motion, the court found the allegations in AJ1's declarations "quite frankly, suspect." This was because when initially asked direct questions about what AJ2 had shown her, AJ1 responded "that she didn't want to see it, didn't look at it, and didn't draw her attention to it[.]" The court found AJ2's statements during the misconduct investigation contrasted drastically with what she now stated in her declaration: "I do not find at this time . . . any reliability with respect to the statements that are set forth in conflicting fashion by [AJ1]" in her declaration. The court denied defendant's motion.

"'On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. [Citation.] Its ruling will not be disturbed unless defendant establishes "a 'manifest and unmistakable abuse of discretion.'"' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 894.) "We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the conduct was prejudicial. [Citation.] In determining misconduct, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (*People v. Collins*, *supra*, 49 Cal.4th at p. 242.)

13

Here, we accept the trial court's credibility determination that AJ1's subsequent statements in her declaration lacked reliability. Indeed, AJ1 was afforded ample opportunity during trial to make known the nature and timing of AJ2's communications with her regarding defendant. That she now asserted the picture shown her was the wanted poster presented to her by the defense was "suspect." Moreover, AJ1 did not participate in the jury's deliberations. AJ2 informed the court earlier that despite whatever she had seen in her "research" she would not discuss it with any of the other jurors and would make any decision in the case based solely on the evidence presented at trial. Furthermore, as one of the participating jurors in the deliberations of the charges against defendant, AJ2 acquitted defendant of Counts 1 and 2. Finally, as the People note, it is difficult to imagine what prejudice would attain from a view of the wanted poster if defendant's neck tattoo was visible in court and from the evidence adduced at trial since the jury would already be fully conversant with defendant's prior status as a wanted man in connection with attempted murder. Thus, we find no misconduct, let alone prejudicial misconduct.

D.    TRIAL COURT'S EXCLUSION OF DEFENSE EVIDENCE

Defendant contends the trial court denied his right to effectively cross-examine witnesses; however, each of the witnesses to which defendant refers were his own. Thus, defendant's contention is more properly denominated as a denial of his right to present a defense. We hold the trial court committed no error of fact or law such that defendant's right to present a defense was not prohibited to the extent that it resulted in a due process violation.

14

"The complete exclusion of defense evidence . . . '"theoretically could rise to [the] level"' [citation] of a due process violation.  But short of a total preclusion of defendant's ability to present a mitigating case to the trier of fact, no due process violation occurs; even "'[i]f the trial court misstepped, '[and its] ruling was an error of law [and] there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.'"'  [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 452-453.)  The trial court has "discretionary power to preclude examination on collateral matters.  [Citation.]" (*People v. Hart* (1999) 20 Cal.4th 546, 607.)

      1.     *SERGEANT DEAN SPIVACKE*

The court requested defense counsel provide an offer of proof for several witnesses he intended to call.  Defense counsel indicated his intent to call Spivacke because he believed Spivacke had taken a statement from Hefele that contradicted the testimony Hefele gave during the prosecution's case in chief.  In particular, defense counsel alleged Hefele told Spivacke he did not believe defendant was trying to kill him. The court ruled, "certainly with respect to Sergeant Spivacke, he would be permitted to testify about the statement that Hefele supposedly made . . . that he didn't think that they were trying to kill him."

In addition, defense counsel indicated his desire to call Spivacke to establish the lighting conditions as it pertained to the officers' ability to identify defendant.  Moreover, defense counsel intended to ask Spivacke about his responsibility for obtaining evidence at the third crime scene.  The prosecutor told the court she had been informed that Spivacke was not at the location at a time when he could opine about the lighting

conditions at night. Furthermore, the prosecutor told the court Spivacke had no responsibility for collecting evidence at the Oak Hills location.

The court ruled it would conduct an Evidence Code section 402 hearing immediately prior to defense counsel calling Spivacke to testify, in order to determine whether he had been at the location at nighttime so as to have a foundation for testifying regarding lighting conditions. In addition, the court would inquire as to Spivacke's responsibility for the collection of evidence regarding the latter incident. If Spivacke answered "no" to either question, defense counsel would be prohibited from asking questions concerning those subjects: "So it's going to require some very brief [Evidence Code section] 402s, as far as the Court is concerned." The next day defense counsel informed the court Spivacke was not needed "at this point." Defense counsel never called Spivacke to testify.

We hold defendant forfeited any issue as to the trial court's purported interference with his right to present a defense with respect to the testimony of Spivacke for two reasons. (See *People v. Valdez* (2012) 55 Cal.4th 82, 125, 129, fn. 30, 176.) First, defendant failed to object to the trial court's requirement of an Evidence Code section 402 hearing regarding Spivacke's testimony. Second, defendant never called Spivacke as a witness. Thus, there is simply no way to tell how the court would have ruled or if it even would have required such a hearing. In any event, we can discern no prejudice to defendant.

16

## 2.    *SENIOR INVESTIGATOR ROBERT MASSON*

At the same hearing discussed above, defense counsel stated he wished to call Masson because he was the primary person in charge of the investigation of the third incident and would "testify that his investigation was lacking in integrity and was incompetent[.]"  The court responded, "as calmly as I can . . . I am holding this hearing not to waste the Court's time or counsel's time. . . .  [¶]  It is not a fishing expedition at this point in time.  I'm asking simply for an offer of proof as to what the relevancy of these witnesses would be and what they would be asked about.  I don't expect it to be a sarcastic response."

Defense counsel responded Masson interviewed a number of potential witnesses, one who made a partial identification of the perpetrator as an Indian from Soboba.  Masson had also purportedly manifested a lack of objectivity when he stated something "to the effect that somebody ought to punch that fat fuck [defendant] right between the eyes."

The People argued the potential witness to whom defense counsel was referring, Mea Lara, was intoxicated and said she had no real recollection of the evening.  The court responded that it was "up to the jury to decide . . . whether or not they believe . . . or don't believe what it is she is saying. . . .  It's not for the court to decide that it's not useful information."  Ultimately, the court concluded it would allow Masson to testify subject to an Evidence Code section 402 hearing prior to his testimony.

Defendant did not call Lara as a witness. Defendant called Masson to testify the next day.[6] Masson testified Hefele informed him Hefele saw three muzzle flashes and that while he was pursuing the suspect, it had not registered in his mind that the suspect was trying to kill him. Defense counsel did not ask any questions regarding a woman's identification of a perpetrator in the case or any aspect of his supervision of the investigation.

Defendant maintains the notion that the trial court could restrict "the defense's use of confrontation to the reports created by law enforcement for the purpose of prosecution constitutes an outrageous, oppressive[,] and utterly baffling abuse of judicial discretion and the law on [defendant's] right of confrontation and compulsory process." Defendant provides no argument or authority for how his rights to present a defense were prohibited. As such, he has forfeited the issue. (*People v. Whalen* (2013) 56 Cal.4th 1, 72, fn. 28 [failure to provide argument or authority supporting the defendant's contention forfeits the issue].) Defendant fails to provide any argument or authority for the trial court's asserted lack of authority to determine the relevance of a witnesses' testimony prior to permitting defendant to call that witness. In particular, here, defendant fails to show the court required such a hearing to determine the propriety of Masson's testimony or limited defendant's questioning of Masson in any way. Moreover, defendant had the opportunity to cross-examine Masson when he was earlier called by the prosecution. Defendant has

---

[6] Apparently, no Evidence Code section 402 hearing took place prior to Masson's testimony.

18

failed to carry his burden that the trial court prejudiced him by restricting his examination of Masson in any way.

### 3. *INVESTIGATOR RYAN BODMER*

At the Evidence Code Section 402 hearing discussed *ante*, defense counsel informed the court he wished to call Bodmer. The People told the court they intended to call Bodmer. Bodmer later testified on behalf of the People that he collected the socks and shorts found near the scene of the last incident. He also took swabs from the grip of a rifle taken from the back of the Jeep for DNA analysis. Defense counsel cross-examined Bodmer.

Supervising fingerprint examiner Roxanne McLean testified she took fingerprints from defendant. She compared those prints and the prints defendant provided upon booking to prints obtained from the Jeep; they matched. Defense counsel cross-examined McLean. During cross-examination, defendant attempted to question McLean regarding a print obtained from the Jeep matching another prior suspect; however, because it had not been discussed upon direct and had previously been excluded during an Evidence Code section 402 hearing, the court sustained the People's objection to the question. Nevertheless, the court noted defense counsel would be free to pursue that line of questioning if and when he called McLean during his own case. Thereafter, defendant indicated he would be calling McLean in his case in order to present evidence that she compared prints found on the Jeep to those of the other prior suspect, Johnny St. Marie.

Defense counsel informed the court he intended to call Bodmer to establish the chain of custody for the prints obtained from the Jeep that belonged to St. Marie.

19

However, when informed that Bodmer did not lift the prints, he informed the court he did not need to call Bodmer. Later, when informed that Bodmer had interviewed St. Marie, the court acknowledged defense counsel may need to call Bodmer to the extent St. Marie's testimony conflicted with the information he gave Bodmer during his interview.

St. Marie was originally arrested for attempted murder of law enforcement in the instant case. The court admonished St. Marie, "You are not going to be asked as to why it was that you were arrested or the cause of you being arrested, and you are not to mention that you were arrested for this at some earlier time. [¶] You're also likewise not going to be asked about, nor should you testify, that the charges regarding the attempted murder of the officers was ultimately dismissed as . . . against you" St. Marie testified the Jeep belonged to his uncle; St. Marie had borrowed it from him from September through December 2007. He testified he wore a size 11 shoe and that his waist size varied between 44 and 48. St. Marie testified he had firearms, a .45-caliber handgun and a rifle, in the Jeep in late December. He let his girlfriend Christina borrow the Jeep on December 27, 2007; he never saw it again.

Defense counsel began to ask St. Marie if, during his interview with Bodmer, Bodmer suspected St. Marie of something. The People objected that the question called for speculation and was beyond the scope of the cross-examination. The court excused the jury and reprimanded defense counsel for "dancing very close to the line of the rulings that the Court has made regarding the admissibility of the . . . nature of the investigator's intent when they were questioning the witness."

20

During the month of December, St. Marie was a parolee wanted by police and was attempting to evade capture. St. Marie testified he would not be surprised if his prints were found in the Jeep or on the firearms. He testified he had prior felony convictions for spousal abuse and carjacking. After his arrest in January 2008, he pled guilty to being an ex-felon in possession of a firearm.

Defense counsel called Bodmer to testify. Bodmer testified he interviewed St. Marie on January 29, 2008, because he was interested in the firearms that had been recovered from the Jeep. St. Marie initially denied he was aware there were any weapons in the Jeep. However, he later informed Bodmer that he may have touched some of the guns found in the Jeep; he described them as an AK-47, a .45-caliber handgun, "a shotgun-style rifle," and a "Desert Eagle." He said the weapons in the Jeep were for sale. St. Marie said he wore a size 11 shoe. He denied being the driver of the vehicle on December 31, 2007.

Defendant maintains the court's requirement that defendant "pinpoint for him the areas of questions that [he] plan[s] on having him respond to" prejudicially inhibited his defense. Moreover, defendant contends the court's restriction of his questioning of Bodmer as it pertained to Bodmer's belief regarding the veracity of St. Marie's statements to him during the interview were an abuse of discretion.

Again, defendant fails to provide any authority for the proposition that a trial court is not permitted to require counsel to provide an offer of proof regarding the relevancy of a potential witnesses' testimony. Here, the court did not prohibit defendant from calling and questioning Bodmer during trial. Rather, the court merely prohibited defense counsel

21

from querying Bodmer regarding his personal opinion as to St. Marie's veracity or guilt. The court's ruling was well within its discretion. Indeed, even expert witnesses—which Bodmer was not called as—are not permitted to express an opinion regarding a defendant's guilt or innocence. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) Here, the jury was the appropriate determiner of St. Marie's truthfulness during his interview with Bodmer and, ultimately, whether he had any culpability in the instant crimes.

### 4. *ERLENA DAILEY AND AMANDA LUGO*

Prior to the testimonies of Erlena Daily and Amanda Lugo, the court requested defense counsel remind it "of the offer of proof as to those two and what it is that they would be testifying to[.]" Defense counsel's offer of proof regarding Daily was that she was a lifelong friend of defendant's sister and had known defendant since she was 14 years old. In early June of 2007, Daily ran into defendant and defendant's sister, Sara,[7] in Las Vegas; defendant and Sara informed her they did not have a place to stay. Daily rented them a suite of rooms in return for $2,500.

Daily left Nevada, but returned in September 2007, when she arranged a long-term rental for them. In November 2007, she again saw them in Las Vegas: "So the significance to me is that [defendant] was out of state for purposes of avoiding problems with the police, especially relevant as to November. . . . She of course cannot say . . . where my client was on December 2nd, specifically, nor can she say where he was specifically on 12/31."

---

[7] We use first names for the sake of clarity because some of the individuals involved in the case share the same last name. No disrespect is intended.

The court responded, "So the only relevancy to her testimony would be that they gave a substantial sum of money to her and were not going to rent a room in their own names but were going to have her rent a suite of rooms in her name for them to stay in." The People objected, noting first that defense counsel's recitation of facts was "quite different than the report I got yesterday." Second, the People argued that whether defendant actually resided in either the suite in September or the long-term rental in November consisted of hearsay.

Defense counsel's offer of proof regarding the testimony of defendant's mother, Amanda, was that she would testify that in June 2007 Beaumont police officers came looking for her and threatened defendant's life. Amanda thereafter went back to prison for a short time on a parole violation. However, later when police were looking for her son, they asked her where he was; when she could not provide his whereabouts, they "took [her] in," she tested dirty, and she was found in violation of her parole again. She was released in February 2008 and saw defendant in Las Vegas in March 2008.

The court noted, "[t]he relevancy that I'm being told that that should be evidence for is the fact that [defendant] fled the jurisdiction of Riverside County because he feared for his safety. But the only person that can testify as to that issue would be [defendant] himself. In other words, everything else . . . the Court believes is otherwise irrelevant but for it coming from [defendant]. "The only person that can testify as to the reason behind the flight, that the 'I fled because I thought I would otherwise—my life would be in jeopardy, even though I was not guilty of this crime,' would be [defendant]." "The only person who can testify as to fleeing for some motivated reason other than just simply the

23

fact that he left, that evidence of leaving, is [defendant], because it would come from his—it would be an explanation of—of the action of moving, if that makes sense."

Defense counsel responded, "this is essentially evidence of an imperfect alibi. Clearly, what I want the jury to infer, is that for whatever his motive, [defendant] was not in California in December[.]" The court replied there was no evidence of that. Defense counsel insisted that from the evidence defendant was residing in Las Vegas in November 2007 and March 2008; the jury could infer he was also living there in December 2007. The court replied, "The ability to travel is what undoes the—the aspect of your argument, and it absolutely is not an—it's not an alibi. It's not an imperfect alibi. It is not evidence of that at all, and if that's the unspoken reason that you really wish to have this evidence presented, I don't see it—evidence of that at all." "It's the reasonableness of the inference that I'm talking about though is—I understand that that's the inference you wish to make, but circumstantial evidence has to be relevant evidence in order to be allowed" into evidence for the jury to make that inference. "[I]t's so far attenuated in this instance, that's—that's why I just am not seeing it."

The court posited that if defense could produce a witness to say defendant was living at the apartment in Las Vegas between the dates of the offenses, she would entertain the admissibility of such testimony insofar as it did not violate late discovery provisions. Thus, if defense counsel could produce evidence of defendant's presence in more temporal proximity to the date of the offenses, the court would consider admitting such evidence. Therefore, the court denied the admissibility of the testimonies of

24

Amanda and Dailey, but would reconsider the matter pending the production of a further, more relevant offer of proof. Trial adjourned for the weekend.

The following Monday, defense counsel asked the court if it had reconsidered its previous ruling regarding the testimonies of Daily and Amanda. The court stated, "the more I mulled, the more I could not think of the relevancy, at least as currently explained to the Court in the offer of proof, and so . . . unless there's some additional information that you have to offer the Court, I would stand by the Court's ruling in terms of the relevancy." Defense counsel stated, "I really don't have any further information from the two of them to add to the Court at this time."

Nonetheless, defense counsel expressed defendant's concern that he was being coerced to testify by the court's ruling. The court responded, "it concerns the Court when I hear it being explained on the record that [defendant] feels coerced into testifying. [¶] [Defendant], make no mistake about it, sir, it is completely your right and your right alone, with the assistance of your counsel in terms of whether or not you decide to testify or not to testify. . . . [¶] In terms of the Court's rulings that I make, I make those based upon the information that I am provided, and it is absolutely no suggestion to you whatsoever. When I make statements that it cannot be established or something cannot be established by the information that the Court is hearing from . . . an overview of what a witness will say, and I suggest that the only person that could otherwise establish the fact would be yourself, does not suggest in any way, shape, or form that you should or should not take the witness stand. It is just a commentary about the point that counsel is

attempting to establish cannot be made based upon what I've heard from the witnesses' summary of what their testimony would be[.]"

Defendant's contention the court was attempting to compel defendant to testify against his will is completely belied by the record. The court discussed, at length, that any testimony by anyone other than defendant regarding the reason for his flight to Nevada would either be hearsay or speculation. This was a sound evidentiary ruling well within the court's discretion. The fact that only defendant could testify regarding his own state of mind in leaving the state did not compel him to testify.

Moreover, even if evidence had been admitted that defendant feared law enforcement for reasons entirely unrelated to the offenses for which he was charged, instruction of the jury with CALCRIM No. 372, the flight instruction, would still have been proper because it would have been up to the jury to determine why defendant fled the state.

Finally, defendant's contention the court effectively eviscerated his alibi does not withstand scrutiny. To the extent the jury would have believed their testimonies, the fact that Amanda and Daily saw defendant in Las Vegas at some vague time in November 2007 and March 2007, was simply too temporally tenuous to constitute an alibi when the crimes for which defendant was found guilty occurred in Riverside County, within four hours driving time of Las Vegas, on specific dates in December 2007. (See *People v. Riggs* (2008) 44 Cal.4th 248, 296-297 ["Contrary to defendant's assertion on appeal that the missing witnesses would have supported his alibi defense, the offers of proof he made at trial showed that these witnesses had nothing to do with establishing defendant's

26

whereabouts, and, further, that their testimony would have been of little assistance to him"].)  The court acted within its discretion in determining Amanda's and Daily's testimonies were irrelevant.

5.    *SARA LUGO*

During its discussion with defense counsel regarding the admissibility of the testimonies of Amanda and Daily, the court noted that defendant's sister Sara, with whom defendant purportedly lived at the time of his arrest, could ostensibly testify defendant was a permanent resident of Las Vegas.  The court was "puzzled as to why she would not be able to come in, take an oath to tell the truth, and say that she saw him in Las Vegas all throughout December[.]"  The following court day, defense counsel stated he had spoken with Sara, but she wished to confer with an attorney before agreeing to testify.  Defense counsel expressed that he intended to call Sara to testify once she became available.  The People noted that it had received no reports at that point establishing the relevancy of her testimony.

The next day, the court requested an offer of proof for Sara's testimony.  Defendant's offer of proof was that Sara was living with defendant in the apartment at the time he was arrested.

The court thereafter conducted an Evidence Code section 402 hearing with respect to the testimony of Sara.  Sara testified she and defendant were in a motel in Las Vegas on December 2, 2007.  On December 31, 2007, she was likewise living with and spent the evening with defendant.  She had been living in Las Vegas for "a couple months"; she had lived in four or five different places with defendant.  They kept moving because they

27

did not want the police to find them. Sara believed the police were going to kill defendant because they had killed two other members of their family and had threatened to kill defendant. At the time they moved to Las Vegas she believed there was a warrant out for defendant's arrest. Sara testified she was residing with defendant on March 28, 2008, the day they were both arrested. She testified she had a black, Glock handgun under her bed in the apartment that day.

After Sara's testimony the court observed that it appeared "she has relevant information regarding the whereabouts of . . . defendant on December the 2nd and December the 31st." The court found the portions of her testimony regarding her living arrangements in Las Vegas and her ownership of the Glock relevant information for the jury. It noted that none of the information to which Sara testified had been made known to the People until that day. Nevertheless, the court barred testimony regarding why Sara was in Las Vegas and why she had been moving around so much because Sara indicated she had never told defendant about the threats to him and was not sure if any other members of her family had communicated such to him. Likewise, the court prohibited any testimony regarding the deaths of the two other family members. It found the deaths as "much more prejudicial in terms of extraneous information that has nothing to do with the crimes involved here or the charges here, and is irrelevant to these proceedings[.]" "[I]t's up to the jury to decide why [defendant] was moving from apartment to apartment." The court and the People also noted Sara had been watching the trial prior to her announcement as a potential witness.

Sara testified before the jury that at the time they were arrested in March 2008, she had been living with defendant in an apartment in Las Vegas for three to five months. They had moved to Las Vegas in October 2007. She saw her brother every day in December 2007, including December 2, and 31, 2007. She purchased the Glock .40-caliber handgun from Nino Garcia in November 2007; she never let defendant use it. She had incurred several felony convictions, most involving firearms. Sara had used 13 aliases, three different birth dates, and several forms of false identification. Sara learned of defendant's arrest in the instant matter in 2008, but did not come forward with the information to which she testified until the day of her testimony.

Defendant complains the court's requirement of an Evidence Code section 402 hearing and the manner of its conduct compromised Sara's trial testimony because "she had been so intimidated . . . as to mitigate her effectiveness as a defense witness to prove [defendant] had relocated to Las Vegas and had remained there during the time of the shooting incidents." Defendant additionally contends the court abused its discretion in the manner in which it restricted her testimony.

We find no evidence of any unlawful intimidation of Sara. The court examined Sara at the Evidence Code section 402 hearing regarding her many prior convictions, because she had just been presented as a witness that day, after the People had already rested their case and in the middle of the defense's case. The People had been given no opportunity at that point to check Sara's criminal history. The court merely examined Sara to give the People some notice regarding impeachment evidence on a witness that was presented far beyond the normal time for discovery.

29

Moreover, Sara was permitted to testify that she had lived with and saw defendant every day of December 2007.  The court's limitation on Sara's testimony regarding a purported war between the police department and her family and tribe was simply not relevant because there was no indication that defendant knew anything about it.  Sara testified during the Evidence Code section 402 hearing that neither she nor any member of her family that she knew of had told defendant about the killing of family members.  Moreover, Sara was not sure if one of the killings had occurred before or after she and defendant were arrested.  The first killing occurred in 2005, severely attenuating any motive for defendant to wait until 2007 to flee from any ostensible intent of the police to assassinate him.  Furthermore, the jury was aware defendant was wanted, as early as July 25, 2007, for the offenses charged in Counts 1 and 2.  Thus, the court acted within its discretion in limiting Sara's testimony to what she observed and not what she speculatively believed defendant might know.

E.     THIRD PARTY CULPABILITY

Defendant contends the trial court abused its discretion in prohibiting defendant's evidence of the third party culpability of Nino Garcia and Johnny St. Marie.  We disagree.

"'[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt[] must link the third person either directly or circumstantially to the actual perpetration of the crime.  In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it

30

is substantially more prejudicial than probative under Evidence Code section 352.' [Citations.] Evidence of a third party's [other] crimes is inadmissible to establish the third party's criminal propensity. [Citations.] For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, "'[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'" [Citations.] A large number of common marks may, when viewed in combination, establish the required distinctive pattern. [Citation.] A trial court's ruling excluding third party culpability evidence is reviewed for abuse of discretion. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 580-581.)

"[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt . . . . [Citations.]" (*People v. Page* (2008) 44 Cal.4th 1, 38.) Where evidence of third party culpability would necessitate a mini trial on the issue, it is properly excluded as creating the possibility of confusing the issues or of misleading the jury. (*People v. Geier* (2007) 41 Cal.4th 555, 582.)

       1.    *NINO GARCIA*

Prior to trial, the People filed a brief seeking to exclude evidence Garcia was involved in the shooting involving the PT Cruiser. Garcia was apparently the owner of the vehicle. On January 15, 2008, Garcia fired upon officers who were trying to apprehend him; the officers returned fire; Garcia was killed.

At a hearing on the issue, the court noted, "It certainly may come out, and it seems to be probative that Nino Garcia or someone owned the PT Cruiser other than

31

[defendant]."  However, the court found that evidence of Garcia's subsequent shootout with the police was more prejudicial than probative on the issue of any third party culpability, i.e. the evidence was "improper character evidence."  Moreover, the court found it would not raise a reasonable doubt as to defendant's guilt; thus, it ruled evidence of the shooting would be excluded.

Here, evidence of a shootout between Garcia and police was more prejudicial than probative because it would have done nothing to connect Garcia to the offenses of December 2, 2007, other than evidence his bad character.  As the trial court noted, there was little doubt that someone other than defendant was in the vehicle on December 2, 2007; however, even if present, evidence of Garcia's subsequent shootout with the police did "not tend to link anyone other than defendant to 'actual perpetration' of the charged crime.  [Citation.]"  (*People v. DePriest* (2007) 42 Cal.4th 1, 44.)  In other words, simply because Garcia had (1) engaged in a shootout in a parking lot, (2) while not inside a vehicle, (3) more than a month after the second incident, did not logically connect him to the shooting of police officers on December 2, 2007, from a moving vehicle.  Moreover, the court specifically did not preclude the admission of evidence of the identity of the owner of the PT Cruiser, which would have linked Garcia to the charged crimes.

Furthermore, overwhelming evidence of the defendant's identity as the shooter was presented during trial.  Defendant matched the description of the shooter provided by the officers.  The shooter fired his shots from the right rear passenger window, not the driver's window.  Swabs of four recent drops of blood were taken from the rear passenger door of the PT Cruiser; DNA profiles of the blood matched defendant.  A .40-caliber

32

Glock firearm was found on the premises when defendant was arrested in an apartment in Las Vegas; shells test-fired from the gun matched those found inside the PT Cruiser. Thus, even if the court erred in excluding the evidence, we conclude it was not reasonably probable a result more favorable to defendant would have resulted in absence of the error. (*People v. Hartsch* (2010) 49 Cal.4th 472, 497-498; *People v. Geier*, *supra*, 41 Cal.4th at p. 583.)

### 2. *JOHNNY ST. MARIE*

The People also sought to exclude evidence Johnny St. Marie was originally charged in Counts 8 through 14 prior to the processing of the DNA and fingerprint evidence in the case. The court ruled in favor of the prosecutor because St. Marie was charged with offenses in this case solely because he was the owner of the Jeep, not because of anything he said when interviewed by police or any other evidence.

Again, evidence St. Marie was previously charged in the instant case did not link him to actual perpetration of the instant crimes. It is certainly understandable the People would charge St. Marie with the instant offenses after determining he was the owner of the Jeep. However, once the People were in possession of the results of the fingerprint and DNA tests tying defendant to the scene of the last incident, it is similarly understandable why those charges were dropped. Moreover, a review of the testimonies of St. Marie and Bodmer, discussed above, make it abundantly clear the jury was at least aware St. Marie was a suspect. Indeed, evidence of St. Marie's criminal record and ownership of the Jeep was adduced at trial. Thus, defendant had ample evidence with

33

which to argue that St. Marie was the actual guilty party.  We discern no abuse of discretion in the trial court's evidentiary rulings.

F.    CUMULATIVE ERROR

Because we have found no error, either alone or in combination with others, defendant's claim of cumulative error fails.  (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RICHLI

Acting P. J.

KING

J.

34